## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

SHARON WEINSTOCK, et al.,

                        Plaintiffs,

            vs.                                    No. 17-cv-23202-RNS

MOUSA MOHAMMED ABU MARZOOK,

                        Defendant.

_____/

## PROPOSED ORDER GRANTING AMENDED MOTION FOR DEFAULT JUDGMENT

This cause comes before the Court on Plaintiffs' Amended Motion for Default Judgment with Incorporated Memorandum of Law filed on October 9, 2018 (the "Motion")[1]. Defendant has failed to file an answer or otherwise defend, and on July, 9, 2018, the clerk entered default. The Court has considered the allegations of the Complaint, the Motion, and supporting documentation including, but not limited to, the declarations of the plaintiffs and other lay and expert witnesses. For the reasons that follow, the Court grants Plaintiffs' Motion for Default Judgment, and will enter a separate judgment in favor of each of the plaintiffs, reflecting these findings.

## INTRODUCTION

This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, arising from the shooting murder of U.S. citizen Yitzchak Weinstock by the terrorist group Hamas – Islamic Resistance Movement ("Hamas") on December 1, 1993, near Jerusalem. The plaintiffs are Yitzchak's estate, mother, and siblings, and the estates of his late father and maternal grandpar-

---

[1] Plaintiffs filed their Motion for Default Judgment with Incorporated Memorandum of Law DE 44 on October 3, 2018. However, they subsequently filed their Amended Motion, which the Court accepts as if timely filed.

ents. The defendant, Mousa Mohammed Abu Marzook ("Abu Marzook"), is a senior leader of Hamas who, while living in the U.S., carried out actions which enabled, facilitated and caused the terrorist attack in which Yitzchak was murdered. *See* DE 1 at ¶¶ 17-35, 44.

Abu Marzook was deported from the United States in May 1997. He was later indicted by a federal grand jury for the Hamas activities from which plaintiffs' claims against him arise, and was declared by the U.S. Department of Justice to be "a fugitive from justice." *Id*. at ¶¶ 31-33. *See also* U.S. Department of Justice Statement, August 20, 2004 ("Chicago and Washington, D.C., Area Men Among Three Indicted in Racketeering Conspiracy in U.S. to Finance Hamas Terror Abroad"), Declaration of Asher Perlin ("Perlin Decl.") at Exhibit A; Second Superseding Indictment in *U.S. v. Abu Marzook, et al.*, 03-cr-978 (N.D. Ill.), Perlin Decl. at Exhibit B.

Defendant Abu Marzook, was served with process in this action as of April 13, 2018. *See* DE 32 at 2 (finding that "service was completed as of April 13, 2018"). However, Abu Marzook "failed to plead or otherwise defend" this action, Fed. R. Civ. P. 55(a), and after his time to do so expired, the Clerk of the Court entered default against Abu Marzook on June 12, 2018.[2]

## DISCUSSION

It is well established that a defendant's default is deemed an admission of all the well-pleaded allegations of the complaint (except those relating to damages), and that before entering default judgment the court must also satisfy itself that it has subject-matter over the action and personal jurisdiction over the defendant, and that the complaint states a claim for relief. *See e.g. TracFone Wireless v. Anadisk LLC*, 685 F. Supp. 2d 1304, 1310 (S.D. Fla. 2010) ("A defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, as set forth in the operative complaint. With regard to the measure of damages, the allegations contained in the complaint are

---

[2] The declaration required by the Servicemembers Civil Relief Act is included in the Perlin Declaration.

not considered admissions by virtue of the default; rather, the Court determines the amount and character of damages to be awarded.") (citations, quotation marks and brackets omitted); *Metro. Life Ins. Co. v. Berger*, 2016 U.S. Dist. LEXIS 157218, at *4 (S.D. Fla. Nov. 10, 2016) ("defendants' default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief") (quoting *Descent v. Kolitsidas*, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005)); *Spy Optic Inc. v. Melbourne Wholesale, Inc.*, 2018 U.S. Dist. LEXIS 17084, at *6 (M.D. Fla. Jan. 31, 2018) ("Before entering default judgment, a court must ensure it has subject-matter jurisdiction over the case."); *Proescher v. Sec. Collection Agency*, 2018 U.S. Dist. LEXIS 118039, at *12-13 (M.D. Fla. June 8, 2018) ("Before entering default judgment, a court should ensure it has personal jurisdiction over the defendant.").

As discussed below, the Court has subject-matter over this case and personal jurisdiction over Abu Marzook, and plaintiffs' allegations state a claim for relief against Abu Marzook under ATA § 2333. Additionally, plaintiffs have demonstrated their entitlement to damages with extensive evidence, as set forth in detail in Part IV below.

## I.        Subject Matter Jurisdiction

The Court has subject matter jurisdiction in this case. Plaintiffs bring this civil action for damages under a federal statute, 18 U.S.C. § 2333. Pursuant to 18 U.S.C. § 2338, the "district courts of the United States shall have exclusive jurisdiction over an action brought under this chapter." Thus, this Court has original subject matter jurisdiction under 28 U.S.C. § 1331.

## II.      Personal Jurisdiction

The Court has personal jurisdiction over Abu Marzook under Rule 4(k)(2) of the Federal Rules, which provides in relevant part that: "For a claim that arises under federal law, serving a summons … establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

Rule 4(k)(2) operates as a "national long-arm statute" which "permits a court to aggregate a foreign defendant's nationwide contacts" for jurisdictional purposes when the defendant does not show that he is subject to the personal jurisdiction of any individual U.S. state, provided that the plaintiff's claims "arise under federal law" and that the exercise of jurisdiction is consistent with Due Process. *Fraser v. Smith*, 594 F.3d 842, 848-49 (11th Cir. 2010). Thus, "[t]he applicable forum for purposes of Rule 4(k)(2) is the United States as a whole." *Barrocos of Fla., Inc. v. Elmassian*, 2012 U.S. Dist. LEXIS 64948, at *23 (S.D. Fla. May 9, 2012) (Scola, J.) (citing *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009)). All of these conditions are met here:

*First*, plaintiffs' claims are of course brought under federal law, i.e. ATA § 2333.

*Second*, to defeat the assertion of jurisdiction under Rule 4(k)(2), the defendant bears burden to show that he *is* subject to jurisdiction in another state's courts of general jurisdiction. *Barrocos*, at *20 ("Because Heng Lee has not identified any other state where it might be subject to personal jurisdiction, this Court is authorized to assume that Heng Lee is not amenable to jurisdiction in the courts of any state, and it may proceed under Rule 4(k)(2).") (citing cases). *See also e.g. Jackson v. Grupo Indus. Hotelero*, 2008 U.S. Dist. LEXIS 88922, at *21 (S.D. Fla. Oct. 20, 2008) (same). By defaulting this action, Abu Marzook has failed to meet his burden under

Rule 4(k)(2). *See Mwani v. Osama Bin Laden*, 417 F.3d 1, 11 (2005) (defaulted defendant forfeits opportunity to show amenability to jurisdiction in a particular state under Rule 4(k)(2)); *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 89 (D.D.C. 2006) ("Hamas … has not appeared to defend against this suit, and therefore it has not conceded to the jurisdiction of any state. Hence, the Court will presume that Hamas is 'not subject to the jurisdiction of the courts of general jurisdiction of any state[,]' under Rule 4(k)(2)); *Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 71 (D.D.C. 2007) ("Rafsanjani has not entered an appearance in this case and thus has not conceded to jurisdiction in another state" under  Rule 4(k)(2)); *Rubin v. Hamas*, 2004 U.S. Dist. LEXIS 20883, at *8 (D.D.C Sept. 27, 2004) (same).[3]

*Third*, the exercise of specific personal jurisdiction over Abu Marzook in this case is fully consistent with Due Process. As the Plaintiffs allege in their complaint, during the years prior to Hamas' murder of Yitzchak Weinstock in December 1993, while Abu Marzook was domiciled and residing in the United States: (i) Abu Marzook helped found and served as the top leader of Hamas; (ii) as a matter of practice and policy Hamas advocated and used terrorist violence against civilians in Israel in order to achieve its goals; (iii) Abu Marzook endorsed and supported Hamas' use of terrorism; (iv) in order to assist Hamas to execute terrorist attacks and achieve its goals Abu Marzook sent millions of dollars to Hamas from the U.S., organized a U.S.-based fund-raising and recruitment apparatus for Hamas, recruited individuals in the U.S. as Hamas operatives, and sent Hamas operatives from the U.S. to the West Bank and Gaza Strip, bearing instructions and funds supplied by Abu Marzook, for the purpose of organizing and funding Ha-

---

[3] Plaintiffs and their counsel represent that they are aware of any particular U.S. state in which Abu Marzook's activities were statutorily and constitutionally sufficient to give rise to personal jurisdiction.

mas terrorist attacks. *See* DE 1 at ¶¶ 17-28. Plaintiffs also allege, quoting the U.S. Justice De-

partment, that:

> From 1988 until February 1993, while living in the United States, Marzook coordinated and financed the activities of Hamas within the United States and elsewhere, first from Louisiana and then from Northern Virginia. During that period, he traveled throughout the United States to meet with other American-based Hamas members, as well as foreign-based Hamas members traveling to the United States for organizational purposes. Abu Marzook additionally maintained constant phone contact with Hamas membership and leadership in the United States and abroad. During this time, he also maintained and shared numerous bank accounts through which substantial sums of money were transferred from bank accounts located outside the United States to other accounts within the United States … for ultimate disbursal to accounts and individuals outside the United States for use in furtherance of Hamas.

*Id.* at ¶ 32.

Abu Marzook's U.S.-based activities enabled Hamas to carry out the terrorist attack in which Yitzchak Weinstock was murdered. *Id.* at ¶¶ 35, 44.

By defaulting this action, Abu Marzook has admitted the allegations of the complaint, including the allegations of the facts supporting personal jurisdiction. *See e.g. Faux Effects Int'l v. Selkirk Painting*, 2008 U.S. Dist. LEXIS 67094, at *4 (S.D. Fla. Sep. 2, 2008) (personal jurisdiction established on basis of factual allegations of the complaint that were deemed admitted by default); *Grange Indem. Ins. Co. v. Walton Transp.*, 2016 U.S. Dist. LEXIS 174236, at *12 (M.D. Fla. Oct. 24, 2016) (same); *SEC v. Brennan*, 2013 U.S. Dist. LEXIS 196767, at *2-3 (S.D. Fla. Dec. 9, 2013) ("By virtue of its default, Defendant OPTZ is taken to admit the well-pleaded allegations of fact Plaintiff's Complaint. Thus, the Court finds that Defendant committed the violations set forth in the Complaint. The Court also finds that it has personal jurisdiction over Defendant.") (citations omitted); *Zucaro v. Patel*, 2016 U.S. Dist. LEXIS 119864, at *10 (S.D. Ala.

Sep. 6, 2016) ("The Amended Complaint … alleges sufficient facts, deemed admitted by the Defendants' default, establishing that personal jurisdiction and venue in this Court are proper.").[4]

Moreover, to further explain and prove the link between Abu Marzook's U.S.-based activities and the murder of the decedent, plaintiffs submitted the declaration of Mr. Arieh Dan Spitzen, a former senior Israeli military and intelligence officer who has broad expertise and experience relating to Hamas and its leadership, and who has repeatedly been qualified as an expert on Hamas in U.S. federal courts. Mr. Spitzen explains in detail Abu Marzook's critical role in building Hamas' organizational, human and material infrastructure in the West Bank and Gaza Strip through his U.S.-based activities in the years prior to the murder, and concludes that "it is my expert opinion that without the extensive leadership, organizational and financial activities on behalf of Hamas initiated and conducted by Abu Marzook from the United States, Hamas would have had extremely limited organizational and operational capabilities, and it is very unlikely that the December 1, 1993 attack would have occurred." Declaration of Arieh Dan Spitzen ("Spitzen Decl.") at ¶ 30.

Mr. Spitzen also quotes numerous other Hamas experts who have similarly concluded that Abu Marzook's U.S.-based activities were crucial to Hamas' operational capabilities. *See e.g. id.* at ¶ 27 (quoting Hamas experts who concluded that "Abu Marzook restored to Hamas its operational ability" and that Abu Marzook provided "financial resources vital to renewal of Ha-

---

[4] Plaintiffs' allegations are also supported by the criminal allegations against Abu Marzook by the U.S. government (*see* Perlin Decl. at Exs. A and B), and by the numerous federal court decisions that have had occasion to discuss Abu Marzook and his activities in the U.S. *See e.g. Marzook v. Christopher*, 924 F. Supp. 565 (S.D.N.Y. 1996); *Abu Marzook v. Christopher*, 1996 U.S. Dist. LEXIS 15007 (S.D.N.Y. Oct. 9, 1996); *In re Grand Jury Subpoena of Elbarasse*, 1998 U.S. Dist. LEXIS 19568, at *5-6, *17-19 (S.D.N.Y. Dec. 14, 1998); *U.S. v. Alwan*, 279 F.3d 431, 435 (7th Cir. 2002); *U.S. v. One 1997 E35 Ford Van*, 50 F. Supp. 2d 789, 794, 800-803 (N.D. Ill. 1999); and *U.S. v. El-Mezain*, 664 F.3d 467, 485-489, 495, 501, 504, 527-528 (5th Cir. 2011).

mas' public and violent activity."); and at ¶ 29 (quoting conclusion of former U.S. Treasury terrorism finance analyst and Hamas expert that "Marzook's operation was critical to the group's survival.").

Thus, Abu Marzook took actions in the United States, which resulted in the injuries to the plaintiffs. This is therefore a case for exercise of specific jurisdiction. To determine whether the exercise of specific jurisdiction conforms with due process the Eleventh Circuit applies a three-part test. "First, we consider whether the plaintiffs have established that their claims 'arise out of or relate to' at least one of the defendant's contacts with the forum. Second, we ask whether the plaintiffs have demonstrated that the defendant 'purposefully availed' itself of the privilege of conducting activities within the forum state. If the plaintiffs carry their burden of establishing the first two prongs, we next consider whether the defendant has made a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Waite v. All Acquisition Corp.*, __ F.3d ___, 2018 U.S. App. LEXIS 23772, at * 10 (11th Cir. Aug. 23, 2018) (citations, brackets, and notes of modification to quotations omitted).

These criteria are easily satisfied here:

***First***, plaintiffs' claims "arise out of or relate to" Abu Marzook's activities in the United States. In this Circuit, a tort "arises out of or relates to" the defendant's activities in the jurisdiction if they are a "but-for" cause of the tort. *Waite* at *11-14. As discussed in the Spitzen Declaration, Abu Marzook's U.S.-based activities were indeed a "but-for" cause of plaintiffs' injuries.

***Second***, Abu Marzook obviously "purposefully availed" himself of the privilege of conducting activities within the United States: he carried out his activities on behalf of Hamas within the United States, while he was domiciled and resided in the United States.

*Third*, the exercise of jurisdiction over Abu Marzook in this case would certainly not violate "traditional notions of fair play and substantial justice." *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 174 (2d Cir. 2013) (exercise of specific personal jurisdiction in ATA action against Lebanese bank which wired terror funds through New York "would not offend principles of fair play and substantial justice."); *Strauss v. Crédit Lyonnais*, 175 F. Supp. 3d 3, 27 (E.D.N.Y. 2016) (same, in respect to French bank); *Weiss v. Nat'l Westminster Bank*, 176 F. Supp. 3d 264, 284 (E.D.N.Y. 2016) (same, in respect to British bank); *Freeman v. HSBC Holdings PLC*, 2018 U.S. Dist. LEXIS 127289, at *194 (E.D.N.Y. July 27, 2018) (same).

Notably, the cases above involved foreign banks which wired alleged terror funds through the United States; all the more so where, as here, the defendant carried out the activities in question while actually physically present in the United States. Abu Marzook was obviously on full notice that his actions could subject him to the jurisdiction of the U.S. courts, and cannot reasonably be surprised to find himself a defendant in this action.

Finally, there are "important U.S. interests at stake" in this action because "the ATA's legislative history reflects that Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013). For this reason, too, "traditional notions of fair play and substantial justice" are not obstacles to the exercise of specific personal jurisdiction in this case.

In sum, this Court can, and does, exercise specific personal jurisdiction over Abu Marzook pursuant to Rule 4(k)(2).

### III.     The Complaint States a Claim under ATA § 2333

Plaintiffs' allegations easily state a claim under ATA § 2333, which provides that: "Any national of the United States injured in his or her person, property, or business by reason of an

act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any ap-
propriate district court of the United States and shall recover threefold the damages he or she sus-
tains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).

Plaintiffs' standing to sue as U.S. nationals or the survivors of U.S. nationals is plead
specifically in the complaint at ¶¶ 8-16, and the allegations relating to the fact that they were in-
jured by reason of a terrorist attack are set forth throughout the complaint.[5]

The phrase "act of international terrorism" used in § 2333(a) is defined in ATA § 2331 as
"activities that (A) involve violent acts or acts dangerous to human life that are a violation of the
criminal laws of the United States or of any State, or that would be a criminal violation if com-
mitted within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to
intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimi-
dation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassina-
tion, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United
States, or transcend national boundaries in terms of the means by which they are accomplished,
the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators
operate or seek asylum." 18 U.S.C. § 2331(1).

The allegations regarding defendant Abu Marzook's conduct that are set forth throughout
the complaint, and particularly at ¶¶ 47-53 thereof, amply satisfy each of these elements of "in-
ternational terrorism" as defined in ATA § 2331(1).

---

[5] Plaintiffs have established that under the law of the relevant domicile (Israel), plaintiffs Sharon Wein-
stock and Moshe Weinstock are authorized to bring this action on behalf of the estates of Yitzchak Wein-
stock and Dov Weinstock and on behalf of plaintiff Geula Weinstock, and that Sharon Weinstock is au-
thorized to bring this action on behalf of the estates of Simon and Shirley Dolgin. See Declaration of Jer-
emy Stern.

### IV.    Damages

**A. The Terrorist Attack and Murder of Yitzchak Weinstock**.

Yitzchak Weinstock was a 19-year old United States citizen who was born and raised in Israel. Sharon 1. Yitzchak came from a family that was warm, loving, and happy. Aryeh 4; T. Dolgin 1. Yitzchak shared an unusually strong bond with his maternal grandparents, Rabbi Simon and Shirley Dolgin. He was "the apple of their eye," and Yitzchak "adored and admired" his grandfather and always treated his grandparents with the utmost respect.. Sharon 6. Horowitz 3; Harel 2. The Weinstocks often spent holidays and vacations with the Dolgin grandparents, and Yitzchak would often visit them in Jerusalem and help them in various ways. Sharon 6; Harel 2. It is not surprising then, that Yitzchak slept at his grandparents' home the night before he was murdered. Sharon 6.

On the morning of December 1, 1993, Yitzchak left his grandparents home to visit his former teachers at a post-high school yeshiva (religious academy) where he had studied the year before. Moshe 2. The yeshiva was located north of Jerusalem, and, as was customary in Israel (and remains so), Yitzchak decided to hitchhike a ride to the yeshiva.

On November 30, 1993, Rabbi Yitzchak Shpatz and his adult daughter, Emunah, had spent the night at a Jerusalem hospital with the Rabbi's young son who was being treated for cancer. Y. Shpatz 1; E. Shpatz 1. They had rented a small car to make the hour-long trip between their home and the hospital more convenient. Y. Shpatz 1. Upon renting the car, Rabbi Shpatz decided to use the car to help others, and prayed that the merit of their good deeds, G-d would cure his son. Y. Shpatz 1.

Yitzchak waited at a hitchhiking station near the northern edge of the city and waited for a ride. He was picked up by Rabbi Shpatz and Emunah who were then returning home from the

hospital. Two other hitchhikers entered the car with Yitzchak. The Shpatzes did not know any of their passengers. However, Emunah recognized one of them – Shalva Ozanah, who had studied in the same teachers college as Emunah. Y. Shpatz 1; E. Shpatz 1-2. The third hitchhiker was dropped off in an industrial zone on the outskirts of Jerusalem. Y. Shpatz 1.

The car proceeded north on Highway 60. Emunah Shpatz was sitting in the front passenger seat and Yitzchak and Shalva were sitting in the rear. Y. Shpatz 2. Emunah and Shalva struck up a conversation. Y. Shpatz 2. As the car approached the Palestinian town of Al-Bireh, approximately 20 minutes outside of Jerusalem, the car's exhaust pipe broke and was dragging under the car. Rabbi Shpatz stopped the car to attempt a simple, if temporary, repair, and Yitzchak exited the car to help. Y. Shpatz 2.

The two were lying on their backs with their upper bodies under the chassis working on the car. Emunah and Shalva remained in the car and chatted. Rabbi Shpatz, heard the sound of a car approaching and slowing, almost to a stop. Suddenly, the sound of automatic gunfire erupted. Y. Shpatz 2. Rabbi Shpatz and Yitzchak both froze in place; it seemed the safest place was under the car. Y. Shpatz 2. The terrorists' car continued slowly forward as the shooters continued their "blazing" gunfire. Shpatz 2. Rabbi Shpatz, who had previously served in a combat role in the military, recognized from the sound of the gunfire that there must have been at least two gunmen armed with automatic weapons. Y. Shpatz 2; E. Shpatz 2.

The bullets were flying around Rabbi Shpatz, and he was hit and injured in several places. Y. Shpatz 1. E. Shpatz 3. Fortunately, his injuries were not serious. Y. Shpatz 1. Rabbi Shpatz heard Yitzchak release a sigh. But, while the shooting continued, they were helpless. Y. Shpatz 3. Only an hour earlier, Yitzchak was visiting with his grandparents at their home in Jerusalem. Glasser 2.

Inside the car, Emunah heard the shooting, but, at first, she did not understand that she and her fellow travelers were the target. E. Shpatz 2. When she heard Shalva scream and saw her fall back on her seat, Emunah ducked for cover as close as she could to the floor of the car. Emunah covered her head with her hands and prayed. E. Shpatz 2.

Finally, the shooting stopped, Rabbi Shpatz saw that Yitzchak had been badly wounded. He was gushing blood from a large wound next to his shoulder. Y. Shpatz. Rabbi Shpatz attempted to stop Yitzchak's bleeding while simultaneously trying to flag cars for help. Y. Shpatz 3. A couple of civilian cars stopped, but none of the drivers knew first aid. This was before the widespread use of cell phones, and none of the drivers had any communications equipment. Y. Shpatz 3. A few minutes later, a military jeep stopped and the officer radioed for additional forces and ambulances. The officer had a small first aid kit. Rabbi Shpatz applied a tourniquet and bandages to stop Yitzchak's bleeding. He then joined Emunah who was unable to help Shalva, who had fallen to the floor in the back of the car. E. Shpatz 2; Y. Shpatz 3. The two administered CPR on Shalva until the ambulances arrived and the emergency medical technicians took over. E. Shpatz 3; Y. Shpatz 3.

Both Yitzchak and Emunah Shpatz were lightly wounded. E. Shpatz 3. Shalva Ozana died of her wounds. Yitzchak Weinstock was taken to a hospital in Jerusalem and was rushed into surgery. His extended family and several friends and neighbors, and even some complete strangers gathered at the hospital to await news and to pray. Sharon 2; Moshe 2; J. Dolgin 2; Horowitz 2. Yitzchak survived for 18 hours while the doctors fought to save his life. But he had multiple injuries and lost massive amounts of blood. Sharon 2.  At approximately 1:00 am the next morning a doctor emerged from the operating room and approached Yitzchak's parents. He tried to break the horrific news slowly because he knew that Dov had previously had a heart at-

tack. Sharon 2. But, as empathetic and gentle as the surgeon was, Yitzchak's death would forever shatter the lives of his parents, siblings and grandparents.

### B. Yitzchak Weinstock.

Yitzchak Weinstock grew up in a "dynamic, boisterous, warm and loving family." T. Dolgin 1; Aryeh 4. Family gatherings were loud and lively, and punctuated by excited conversations and "exchanges of ideas." T. Dolgin 1. As a strong and confident teenager, Yitzchak was often at the center of the action. T. Dolgin 1.

In addition to being both assertive and poised, Yitzchak was also sensitive and considerate. Luwisch 1-2; T. Dolgin 1. Tamara Kay Dolgin, Yitzchak's aunt by marriage, recalls a particularly loud family gathering that left her, as a young woman from Indiana, feeling lost and confused. T. Dolgin 1. "Yitzchak glanced at me … and I could see that he felt all kind of sorry for me, and his look told me that he understood it all." Id. "*Parlez vous Francais*?" Yitzchak asked his new aunt. Surprised, she asked in return, "Yitzhak, do you speak French?!" Yitzchak answered "No, but I don't want you to feel alone. That's all the French I know. Don't feel bad. You're family. You'll get it." T. Dolgin 1.

Yitzchak Weinstock was charismatic and full of life. Luwisch 1; Aryeh 1. He enjoyed hiking, rappelling, scuba diving and hang gliding. Moshe 1; Aryeh 1; Luwisch 1. He was an outstanding athlete who excelled in basketball. Aryeh 1; Luwisch. 1. As a good ball-player, Yitzchak used his influence to include weaker players who could have easily been left on the sidelines. Sharon 2.

Yitzchak used his many talents to help others. Luwisch 2. Yitzchak volunteered to help

farmers with their agricultural work. Luwisch 2. He also joined the search and rescue organization that his father had established to help hikers lost in the dessert. Luwisch 2. And, when a teacher shared with Yitzchak the news that the teacher was leaving the school and relocating his family, Yitzchak traveled to the teacher's new home and voluntarily upgraded the electrical infrastructure in the house. Luwisch 2.

Yitzchak's family were high-achievers. His father, Dov Weinstock, was blessed with many talents. He was a "brilliant man" who had obtained patents for several of his own inventions. Moshe 4. Dov was also charismatic and eloquent, and used his natural skills to serve his community. Sharon 4. As a volunteer project, Dov established and directed a search and rescue team to rescue hikers who would occasionally lose their way while trekking in the Judean Dessert. Luwisch 2.   Dov earned a living running a company that installed and repaired heaters. Sharon 1.

Yitzchak's mother, Sharon Weinstock, is an occupational therapist who holds a Master's degree in education. Berenblut 3. Prior to the terrorist attack, Sharon was an educator and worked in special education as the vice principal of a school in Jerusalem. Sharon 1-2. She described her work prior to Yizchak's murder as "very challenging and satisfying." Sharon 1-2. In addition to her work, Sharon managed to raise her five children, one of whom – daughter Geula ("Gili") – suffered from severe developmental disabilities. Sharon 1.

Yitzchak inherited his parents' intelligence. Aryeh 1; Sharon 6. He was an inquisitive student. Luwisch 1. Even outside of school, during his frequent visits to his grandparents, Rabbi Simon and Shirley Dolgin Yitzchak would study Talmud or Bible with Rabbi Dolgin. Harel. Yitzchak had figured out how to construct his own stereo system from pieces of old, broken sets.

Aryeh 1. Yitzchak's former teacher, Rabbi Baruch Luwisch described Yitzchak as a student leader and "trailblazer." Yitzchak was "considerate, fun to be around, and had a great sense of humor." Aryeh 1; Luwisch 1; Tamara Kay Dolgin 1; Sharon Weinstock 2.

Once, while hiking in the Judean hills, Yitzchak and his friends discovered an old dried-up spring. Aryeh 2. Yitzchak and his friends excavated the site, and eventually, they succeeded in reviving the spring, which has since been renamed in Yitzchak's memory. Aryeh 2. Although Yitzchak had many varied interests, his mother said that Yitzchak likely would have pursued a career in engineering or computer science. Sharon 7; Berenblut 3.

### C. The ATA extends to Plaintiffs the full array or tort remedies.

Section 2333 of the ATA provides: Any national of the United States injured in his or her person … by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.18 U.S.C. § 2333(a). Section 2333 allows actions by nationals of the United States, their estates, survivors, or heirs, which includes all of the Plaintiffs herein. Even Dov Weinstock, who was not a United States citizen, is included among those permitted to bring claims under Section 2333. As Yitzchak's father, Dov was a "survivor" of a United States national who was murdered in the terrorist attack. The ATA "contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States, and this court will not read such a requirement into the statute." *Estates of Ungar v. Palestinian Auth.*, 304 F. Supp. 2d 232, 271 (D.R.I. 2004). See also, *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006)("it is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national.").

Further, U.S. nationals who are the relatives of a person killed by terrorists are themselves "victims of international terrorism." *Estates of Ungar*, 304 F. Supp. 2d at 263. *See also Biton v. Palestinian Authority*, 310 F. Supp. 2d 172, 182 (D.D.C. 2004) (U.S. citizen may assert direct claim under ATA for murder of family member, irrespective of decedent's nationality). Similarly, surviving U.S. national grandparents like Rabbi and Mrs. Dolgin, who shared an unusually close relationship with Yitzchak, are considered to be victims of international terrorism and are entitled to damages under the ATA. *See e.g., Lelchook v. Commerzbank*, 2011 U.S. Dist. LEXIS 106305, at *5 (S.D.N.Y. Aug. 1, 2011) (*"*Nothing in the statute limits the ability of [survivors] to sue; as long as the proximate cause of the injury is alleged to be 'by reason of an act of international terrorism,' *id*., the claim may be brought."); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017) (awarding damages to grandparents for terrorist killing of granddaughter under the terrorism exception to the Foreign Sovereign Immunities Act).

In the instant case, an award to Yitzchak's grandparents' estates is particularly appropriate for the additional reason that the Dolgins were especially susceptible to emotional harm and suffering due to the premature deaths of two of their daughters, one at the age of 14 and the other as a 35-year old mother of three young children. Several witnesses noted that the Dolgins' own experience of losing children, made them agonizingly (hyper)empathetic to their own daughter's (Sharon's) loss of her son Yitzchak. Sharon 6; Glasser 2-3 J Dolgin 2-3; M Dolgin 2-3; Bachrach 2-3. In other words, the Dolgins were classic "eggshell plaintiffs."

It is well established that federal tort statutes incorporate the "eggshell plaintiff" rule, i.e., that a defendant must take the plaintiffs as he finds them. "FELA and other federal statutes incorporate the 'eggshell skull' rule to prevent defendant from avoiding liability in certain cases." *Stevens v. Bangor & Aroostook R.R.*, 97 F.3d 594, 602 n.8 (1st Cir. 1996) (citing *Jordan v.*

*Atchison, T. & S.F. Ry.*, 934 F.2d 225, 228-29 (9th Cir. 1991) (FELA case noting that it is a well-settled principle of tort law that the defendant must take the plaintiff as it finds him); *Avitia v. Metropolitan Club of Chicago*, 49 F.3d 1219, 1227-28 (7th Cir. 1995) (same under Fair Labor Standards Act); *Doty v. Sewall*, 908 F.2d 1053, 1059 (1st Cir. 1990) (same under Landrum-Griffin Act)).

Applying the "eggshell rule" in ATA actions is particularly appropriate, since "Congress meant to incorporate the full range of traditional tort principles into the ATA." *Lelchook v. Commerzbank AG*, 2011 U.S. Dist. LEXIS 106305, at *6 (S.D.N.Y. Aug. 1, 2011) (citing *Boim v. Quranic Literacy Inst. and Holy Land Found for Relief and Dev*., 291 F.3d 1000, 1010 (7th Or. 2002)). Indeed, the courts have consistently construed the damages available under the ATA very broadly. See e.g. *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005); *Ungar v. Palestinian Authority*, 304 F. Supp. 2d 232, 267 (D.R.I. 2004).

Section 2333 does not specify the nature of damages that can be recovered. However, courts construing this provision have found that it extends to plaintiffs the full array of tort remedies, including both "the broadest range of economic damages" as well as solatium and other non-economic damages. See *Estates of Ungar v. Palestinian Auth*., 304 F. Supp. 2d 232, 266-67 (D.R.I. 2004); *Lelchook v. Commerzbank AG*, 2011 U.S. Dist. LEXIS 106305, at *6 (S.D.N.Y. 2011) (citing cases). Thus, the estate of Yitzchak Weinstock is entitled to recover economic damages for lost earnings; and the remaining plaintiffs may recover damages for the severe emotional injuries they suffered, otherwise known as solatium damages. See *id*. "Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to plaintiffs closely related to a victim of terrorism. Acts of terrorism are by their very def-

inition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 273 (D.D.C. 2003)

Courts addressing the availability and amount of solatium damages in terrorism cases have traditionally looked to prior similar cases awarding solatium or emotional damages. *Estates of Ungar*, 304 F. Supp. 2d at 270-77; *Stansell v. Revolutionary Armed Forces of Colom. (FARC)*, No. 8:09-cv-2308-T-26MAP, 2010 U.S. Dist. LEXIS 149212 (M.D. Fla. June 14, 2010). Moreover, courts considering damages in cases decided under the Antiterrorism Act, 18 U.S.C. §§ 2331, et seq. have considered damages awards in other terrorism cases, including those decided under the related terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A (and the former terrorism exception 1605(a)(7) for cases decided prior to 2008). See e.g., *Estates of Ungar*, 304 F. Supp. 2d at 263; *Rubin v. HAMAS--Islamic Resistance Movement*, 2004 U.S. Dist. LEXIS 20883 (D.R.I. 2004); *Stansell v. Revolutionary Armed Forces of Colom. (FARC)*, No. 8:09-cv-2308-T-26MAP, 2010 U.S. Dist. LEXIS 149212 (M.D. Fla. June 14, 2010).

Applying this methodology, courts have formulated a widely-accepted framework for calculations of damages awarded to victims of international terrorism. In *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006), the court surveyed past terrorism awards in the context of deceased victims of terrorism, and found that parents of those killed in terrorist attacks typically received damages awards of $5 million and siblings received $2.5 million. The court also specified "baseline" amounts awarded to other relatives, such as spouses. See id. In *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017), the court awarded $2.5 million in compensatory damages to each of the four grandparents of a baby killed in a terrorist

attack. The court found that the grandparents suffered greatly from witnessing the effects of the murder of the baby on the baby's parents. Id.  In *Valore v. Islamic Republic of Iran*,  700 F. Supp. 2d 52, 85 (D.D.C. 2010), the court observed that the *Heiser* framework, which bases terrorism damages awards upon typical prior terrorism awards is "an appropriate measure of damages for the family members of victims." The D.C. Circuit recently agreed that that *Heiser* framework reflects reasonable baseline awards, and reaffirmed that "past solatium awards from comparable cases are appropriate sources of guidance for district courts." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361-62 (D.C. Cir. 2018). The *Fraenkel* court held that while *Heiser* is not binding on other courts, it provides a "useful reference point" to which courts may adhere or depart upwards or downwards in their damages awards, depending upon the circumstances of the case and the discretion of the judge. 892 F.3d at 351. As explained below, the Court finds that the *Heiser* framework should be applied to the calculation of non-economic damages in the instant case.

**The Estate of Yitzchak Weinstock is entitled to an award of $1,291,000 for lost earnings.**

The Plaintiffs have introduced the verified economic report of Mark Berenblut, a forensic and investigative accountant educated at the London School of Economics, and qualified in the United States and Canada. Berenblut Appx I. Mr. Berenblut's CV is attached to his report. *Id*. Mr. Berenblut authored a text called, "Proving Economic Loss," which was a loose-leaf service updated semi-annually, and dealt very significantly with the calculation of economic losses in personal injury, fatality, medical malpractice, and similar cases. See Berenblut 1; Appx I.  Mr. Berenblut has testified on numerous occasions as an expert witness on economic losses, and submitted a list of his appearances in that capacity over the last four years. Berenblut 1 Appx I. In an unrelated case that involved tragically similar facts to the case at bar, Mr. Berenblut's ex-

pert testimony regarding the lost income of another American teenager murdered in a Hamas ter-rorist attack. *See Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

In calculating Yitzchak Weinstock's lost earnings, Mr. Berenblut considered two scenari-os. ***First***, he calculated a range for Yitzchak's projected lost earnings based upon an assumption that he would have made his career in Israel. ***Second***, because Yitzchak was an American citizen, Mr. Berenblut calculated an alternative income based upon the possibility that Yitzchak would have made his career in the United States.[6] Mr. Berenblut calculated lost earning ranges under both scenarios by reducing the projected future income to present value after reducing it to ac-count for taxes and personal consumption. Berenblut 3. Mr. Berenblut considered Yitzchak's skills and interests in calculating his anticipated future earnings. *Id*. Mr. Berenblut's methodolo-gy is further detailed in his report.

Mr. Berenblut concluded that the total adjusted lost earning amount based upon a career in the United States would have been approximately $2,720,000 U.S. dollars. Berenblut 2. Under the scenario in which Yitzchak would have pursued a career in Israel, Mr. Berenblut calculated the loss to be approximately$1,271,000 U.S. dollars. Berenblut 2.

In addition to his superior academic performance, Yitzchak demonstrated strong interper-sonal and leadership skills, initiative and a solid work ethic. Yitzchak would have likely been very successful in any career he would have chosen. However, because the Court finds that Yitzchak would likely have remained in Israel where most of his family continue to reside, the Court accepts the calculation of lost earnings based upon a career in Israel rather than one in the

---

[6] As Yitzchak's brother Aryeh testified, Yitzchak was more "American" than Israeli in his ways and personality. Aryeh 1.

United States. The court awards damages for lost earnings in the realistic and conservative amount of $1,291,000 million.

**D. Solatium and other emotional damages.**

    **1. Sharon Weinstock is entitled to solatium damages in the amount of $5 million for the murder of her son.**

Sharon Beth Weinstock was born and raised in Los Angeles, California. Her father, Rabbi Simon Dolgin, was the rabbi of one of the most prominent Orthodox Jewish synagogues in Los Angeles. He was a community leader and an educator. Sharon's mother, Shirley Dolgin, shared with her husband the yoke of community leadership until 1970, when Rabbi Dolgin was offered a pulpit in Jerusalem and the family relocated to Israel. Sharon 1.

Sharon met and married Dov Weinstock, an Israeli citizen, and the young couple settled in Alon Shvut, just outside of Jerusalem. Dov earned a good living installing and repairing heaters, and Sharon, an occupational therapist, had a job at a hospital in Jerusalem.

Their first son, Moshe, was born in 1972, followed by Yitzchak in 1974. Daughter Geula ("Gili") was born in 1978. Gili suffered from various developmental disorders, and Sharon was forced to leave her job to care for the baby. But she returned to work one year later as life fell back into a routine. Sharon and Dov had two more sons, Aryeh, born in 1979 and Mishael[7], born in 1988. Sharon 1.

Despite her responsibilities as a mother of a large family, including a child with severe disabilities, Sharon advanced in her profession, was hired by the Ministry of Education to work in special education, and eventually became the vice principal of a school. Sharon says her work at the school was "very challenging and satisfying." Sharon 2.

---

[7] Plaintiff, Chaim Mishael Weinstock, goes by his middle name, "Mishael." In the Complaint he was referred to by his first name, "Chaim." But, in the declarations he is referred to as "Mishael." And his own declaration is cited to using the name "Mishael." The Certificate of Birth Abroad, which was filed as exhibit A to his declaration, reflects both names.

The Weinstocks family was very close and happy. Aryeh 3. Aryeh Weinstock relates, "there was a sense of togetherness that is hard to describe." Aryeh 3. The family would go away together on weekends and take camping trips, all sharing one big tent. Aryeh 3. And, when Moshe and Yitzchak grew older and started attending boarding school, the family would still be together for the Sabbath, times that were "filled with laughter and friends, long walks and story telling." Aryeh 3. The last night Yitzchak slept at home. Sharon went into Yitzchak's room and watched him sleeping. She reminisced about watching him, as a baby, sleeping in his bassinet; Sharon reflected on "what a beautiful young mand he had grown into." Sharon 2.

On the morning of December 1, 1993, Sharon was at work in Jerusalem when a social worker from her community called to tell her that there had been a terrorist attack and that she was coming to see Sharon. Sharon 2. Intuitively, Sharon understood that Yitzchak had been hurt. The social worker drove Sharon to the hospital, where Dov and some family friends and neighbors were already waiting. Sharon 2. That was when she heard that Yitzchak was in critical condition. Sharon 2.

Sharon caught only a glimpse of Yitzchak as the medical staff wheeled him into surgery. Sharon 2. Sharon. Dov, and their family and friends who gathered at the hospital began to pray and wait anxiously for news. Sharon.2. "We knew he was fighting for his life. They told us he had a chance. We had hope. None of us believed he wouldn't make it." Sharon 2.

Yitzchak fought for 18 hours. Sharon 2. But his injuries were too numerous and too severe. He lost so much blood. Sharon 2. Finally, at approximately 1:00 am, the next morning, the surgeon came out of the operating room. He stood at a distance from the family. Aware that Dov had suffered from a heart condition, the doctor broke the news slowly. Sharon 2.

Sharon went into the operating room by herself to say goodbye to her son. Sharon. 2. She

looked at Yitzchak's face, which she said looked, "whole, uninjured, beautiful." Sharon 2. She kissed Yitzchak and told him how much she loved him. Dov also came into the room, but could not bring himself to come close. Sharon 2. Today, Sharon says, "It was the worst moment of my life. I felt like I was giving up a part of me. He will always be a part of me." Sharon 2. Jonathan David Bachrach, a life-long close family friend, says that since Yitzchak's murder, he has not once heard Sharon Weinstock laugh. Bachrach 4.

When Yitzchak was murdered, Sharon, who had been "such a strong and good parent," completely fell apart. Moshe 3; Aryeh 3. Her daughter-in-law, Miriam says, "Sharon was completely shattered." Miriam 2.  Sharon became a mere shadow of her former self. Miriam 2.  Sharon, herself, agrees. "When Yitzchak was killed, my whole world crashed down around me." Sharon 3.  I functioned like a robot, just going through the motions. Sharon 3. Sharon was overwhelmed by the realization that "I no longer knew where one of my children was." Sharon 3. Sharon spoke with rabbis and mental health professionals. Sharon 3. One counselor told her that "parents are like the walls of a home, and if the parents fall, the home falls apart." Sharon 3. But that advice did not help.

For at least a month after Yitzchak's murder, Sharon "stayed in bed and slept or cried all the time." Moshe 3; see also Miriam 2. Her son, Aryeh states, "It seemed to me as if she was almost blacked out for two years or more, before she finally started to regain her footing." Aryeh 2. Sharon recalls that for approximately two years, "I was totally out of it," Sharon 3. She could neither work nor function at home. Sharon 3. "It was as if I had been hit by a steamroller." Sharon 3.

Moshe relates that because his parents were "completely unable to deal with day-to-day responsibilities," he paid the costs of his own college education, without asking them to help.

Years after he completed his university studies, his mother asked him, "Hey, how did you pay for college?" Moshe explains that his mother had been completely oblivious as a result of the shock and grief following Yitzchak's murder. Moshe 3.

Sharon's break-down as a mother was manifest most prominently for her son, Mishael, who was five years old at the time. Mishael 1. He "saw the impact on his parents every single day." Mishael 2. He remembers coming home from school only to find his mother asleep. Mishael 2. There was an atmosphere of tension and sadness, a heavy, dark cloud over her." Mishael 2. "She took care of the basic things, such as paying the bills, making the meals, and other aspects of the daily routine. Emotionally, she was never there." Mishael 2. Sharon, herself, recalls that even "the basic things" required herculean effort: "[o]ne morning soon after the funeral, I needed to pick out clothing for my youngest son, Mishael, who was five and a half. It was an ordinary task, the kind of thing I had done every single day for so many years. But suddenly, it took all the energy I could possibly muster to do it. Sharon 3. Sharon recalls another time when Aryeh unexpectedly returned home from school only to find her collapsed into bed. "I was terribly embarrassed; I didn't want him to see me like that." Sharon 3.

Sharon and Dov "were so shattered by the loss of Yitzchak that they could not bring themselves to participate in Moshe and Miriam's wedding. Moshe 2; Miriam 2. In fact, Sharon disappeared for much of the celebration. Moshe 2. Aryeh says that the photos from his wedding also show the "sadness in my mother's face." Aryeh 3. Sharon relates that her deep enduring sadness caused by Yitzchak's death made it impossible for her to enjoy any of her children's weddings. Sharon 6.

Since Yitzchak's murder, Sharon's life has been filled with fear and sorrow. Miriam 2; Aryeh 3. Sharon lives in constant fear that something terrible will happen. Sharon 6. Her feelings

of loss are always with her. Yitzchak's death created "a void that cannot be filled." Sharon 7.

"Every family occasion is haunted by the knowledge that Yitzchak should be there, but isn't."

Sharon 7. As Aryeh observes, since Yitzchak's death, "a tremendous sadness took over her life

and all of our lives." Aryeh 3.

The Court applies the *Heiser* framework and awards Sharon Weinstock $5,000,000 in so-

latium damages for the loss of her son to the terrorist murders. *See Braun v. Islamic Republic of*

*Iran*, 228 F. Supp. 3d 64, 85 (D.D.C. 2017); *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018

U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### 2. The Estate of Dov Weinstock is entitled to solatium damages in the amount of $5 million for the murder of Dov's son.

Yitzchak Weinstock's father, Dov was not a United States national. However, he was en-

titled to bring suit under Section 2333 as the survivor of a victim of the terrorist attack. See 18

U.S.C. § 2333(a). Dov Weinstock passed away in 2007. Sharon and Moshe Weinstock, the wid-

ow and eldest son of Dov Weinstock pursue Dov's claims on behalf of his estate[8].

Dov Weinstock suffered immeasurably as a result of Yitzchak's murder. In the words of

Moshe Weinstock, Yitzchak's murder caused Dov "to go completely off the rails." Moshe 3. Ar-

yeh states that "[t]he impact of Yitzchak's death on my father was very obvious and dramatic. It

felt like we lost a big part of our father along with our brother." Aryeh 3. Mishael states that their

father "was completely unable to cope." Mishael 2. Sharon agrees. "Yitzchak's death hit [Dov]

like a ton of bricks." Sharon 3. It was not only the initial shock and grief that derailed Dov. He

suffered from his intense grief and was haunted by Yitzchak's violent death for the remaining

years of his own life.

---

[8] The administrators of the Estate of Dov Weinstock are Co-Plaintiffs, Sharon Weinstock and Moshe Weinstock.  Sharon 1.

After the murder, Dov said that one of his contacts in the Israeli security establishment shared with him photographs of the terrorists suspected of committing the murder. With the photos in hand, Dov would spend his nights driving into Arab villages, claiming he was searching for his son's killers. Moshe 3. This was obviously exceedingly dangerous, and had almost no chance of success. Dov would later confide to Moshe that he "had a kind of death wish. With the loss of Yitzchak, he lost his own will to live." Moshe 3. Aryeh confirms that Dov said things to him that demonstrated this "death wish." Aryeh 3. "He simply didn't care whether he died or not. He could no longer enjoy any aspect of life. For him, every day was another day of unhappiness." Aryeh 3.

Dov became withdrawn from the children – an "absentee father." Sharon 4; Mishael 2-3. Dov's emotional breakdown was so complete that he approached his oldest son, Moshe, and asked him to "take over" as father of the family. Miriam 3. Dov claimed that he had lost the emotional strength to fulfil his parental obligations. Miriam 3. Moshe declined. Miriam 3. Moshe was only 21 at the time of Yitzchak's murder and was about to get married and establish his own home. Nonetheless, as a practical matter, with Dov unable to function, Moshe was forced to step up and serve as a sort of "surrogate father" for his brothers and sister. Moshe 2; Miriam 3-4.

For years after Yitzchak's murder, Dov continued to spend his nights driving around nearby villages and the dessert, often with his young son, Mishael, asleep in the back seat. Mishael 3; Miriam 2; Sharon 4. Dov's heart problems worsened significantly. Miriam 2. He gained weight and began smoking heavily. Sharon 4. "[H]e was constantly tormented." Miriam 2. When he was home, he was "constantly tense," and had angry outbursts. Sharon 4; Aryeh 3. He would often become frustrated and angry – in particular, with Gili. Mishael 3. Dov's daughter-in-law, Miriam, relates that Dov would "come frequently to our … home, sit on the sofa, and unburden

himself to me." Miriam 2. However, Dov refused to see a therapist consistently. Sharon 4. "[H]e was too preoccupied and unable to be receptive to their suggestions." Sharon 4.

"Dov never recovered from [Yitzchak's] murder." Miriam 2. In 2007, Dov suffered from his final, fatal heat attack. Aryeh 3.  Dov died, grief-stricken and tormented by his son's murder at the hands of the Hamas terrorists. The Court applies the *Heiser* framework and awards Dov Weinstock $5,000,000 in solatium damages for the loss of his son to the terrorist murders. See *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 85 (D.D.C. 2017); *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### 3.  Moshe Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of his brother.

Moshe Weinstock was only a year and a half older than Yitzchak. Moshe 1. Moshe says "we were always together; it was like being twins." When they were young, they shared a bedroom; played together, shared the same friends, walked to school together. Moshe 1; Sharon 5. The brothers were so close, Moshe says, "It's hard for me to remember any time without him." Moshe 1; See also Jess Dolgin 3.. Even after Moshe and then Yitzchak left home to attend boarding school for high school, the two remained close. Moshe 1. They participated in wilderness activities, including hiking and camping, together. Moshe 1. "We had many heart-to-heart talks and came to rely on each other." Moshe 1. During their late teen-age years, Moshe and Yitzchak remained close, taking advantage of their weekends at home and breaks from school to spend time together. Moshe 1.

Moshe and his wife had decided to become engaged, and the two chose December 2, 1993 as the date on which they would share the happy news with their families. Moshe 1. But, Yitzchak was murdered the day before the hoped-for joyous announcement. Moshe 2.

On December 1, 1993, Moshe Weinstock was in southern Israel performing his mandatory military service when he heard a news report of a terrorist attack outside of Jerusalem. Moshe 2. After someone informed Moshe that Yitzchak had been wounded in the attack, he attempted to call home, but nobody answered the phone, so Moshe rushed to Jerusalem, "first to one hospital, and then to another before I found them." Moshe 2. Moshe recalls that the family were all shocked and frightened. Moshe 2. Moshe joined the family crying and praying throughout the night as the surgeons fought to save Yitzchak. Moshe 2. The shock of Yitzchak's death hit Moshe so hard, he cannot clearly recall the events at the hospital or Yitzchak's funeral. Moshe 2.

Yitzchak's death was a terrible blow to Moshe. Sharon 5. He did not know how to process his grief. Moshe 2. After the funeral and the traditional mourning period, Moshe thought that the way to deal with his grief was to throw himself back into his military service. Moshe 2. He returned as soon as he could to his base. But, Moshe says, "I couldn't handle it. I turned around and went home." Moshe was in "deep shock" and remained at home for several weeks. Moshe 2.

For many months following the murder, Moshe felt anxious and tense. Moshe 2. Indeed, to this day, Moshe finds if very difficult to talk about Yitzchak's death or his own suffering that resulted from his best friend and brother. Miriam 3; Sharon 5; Jess Dolgin 3. For several years Moshe could not bring himself to speak at annual memorial services for Yitzchak. Miriam 3. "[H]e carried much pain and unresolved issues that he had had with Yitzchak, which weighed heavily upon him." Miriam 3.

Moshe continues to live with the pain. It is very difficult for him to talk about or otherwise engage in the subject of Yitzchak's murder. Miriam 3; Jess Dolgin 3. Moshe says, " The loss of Yitzchak hangs over our entire family to this day and affects many things. I continue to

think about him all the time." Moshe 3. Moshe and Miriam named their first son, "Yitzchak," in memory of Moshe's brother. Moshe 3; Sharon 4. But, even this gesture, which was intended to honor Yitzchak, was met with fierce opposition by Dov, causing strife and conflict between Moshe and Dov. Sharon 4.

The Court applies the *Heiser* framework and awards Moshe Weinstock $2,500,000 in solatium damages for the loss of his brother to the terrorist murders. See *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### 4. Geula ("Gili") Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of her brother.

Geula ("Gili") Weinstock is the severely disabled sister of Yitzchak Weinstock. Sharon 2; Moshe 2; Miriam 4. She is not legally competent and has not submitted her own declaration. See Sharon 1. Gili was approximately four years younger than Yitzchak, and was born with developmental disabilities, severe learning disabilities, and mildly poor cognitive functioning. Sharon 2, Miriam 4; Dr. Pollak 1. She required a hearing aid from a very young age. Dr. Pollak 1. Her disabilities were severe enough that after Gili was born, Sharon felt the necessity to take a year off from her career to seek proper help for Gili. Sharon 2.

Gili has trouble expressing herself and she did not provide a declaration for this matter. However, others discussed in their declarations the impact Yitzchak's death had on Gili. Gili felt very close to Yitzchak. Moshe 2. The emotional impact of the loss of her brother was very obvious to others. Sharon 5; Moshe 2; Miriam 4. Following Yitzchak's murder, Gili began displaying "terrible behavioral problems." Sharon 5; Moshe 2. Previously, Gili was "a warm, cooperative and very pleasant and well-liked child with much charm." Dr. Pollack 1. But as a result of Yitzchak's murder, Gili began having emotional outbursts, and displayed rigidity, and obsessive behavior. Dr. Pollack 2; Sharon 5; Moshe 2 ("Gili began having frequent and very extreme emo-

tional outbursts. She became irritable and nervous all the time."); Miriam 4. Whereas prior to Yitzchak's murder, Gili got along well with others and was cooperative in school, as a result of Yitzchak's death, Gili "completely changed; now the learning problems were compounded by serious emotional problems." Sharon 5. Mishael Weinstock states that Yitzchak's absence created much chaos in Gili's mind. Mishael 3.

Dr. Sarah Pollak was Gili's physician from her birth in 1978 until 2008. Pollak 1. Additionally, Dr. Pollak is a neighbor of the Weinstock family, and Dr. Pollak's own daughter was a classmate and friend of Gili's. Pollak 2. Growing up, Gili spent much time at Dr. Pollak's home and Dr. Pollak knows Gili well on a personal level as well as in her professional capacity. Pollak 2. Dr. Pollak recalls that Gili was warm, cooperative and very pleasant and well-liked as a child. She had "much charm." Pollak 1. However, when Gili was 15 years old, Yitzchak was killed and the "shock and of the tragedy and magnitude of the loss took a terrible toll on the entire Weinstock family, including Gili. Pollak1.

Gili had been studying in a main-stream school where she made much progress. Sharon 5; Moshe 2; Pollack 1. But after Yitzchak's death, she refused to continue. Sharon 5; Pollak 1. Ultimately, Sharon had no choice but to transfer Gili to a less favorable school in another city. Sharon 5; Pollak 1. Her new program was for children with much more severe disabilities. Moshe 2. In the aftermath of Yitzchak's murder, Gili developed many behavioral difficulties, including, severe anxiety, outbursts of anger, obsessive behaviors, and other manifestations that compounded her physical disabilities. Pollack 1-2. Gili transferred schools several times, eventually finding some stability when she moved into a residential community for special-needs young adults. Sharon 5. But, ultimately, Gili moved back home. Sharon 5.

Gili's personal loss of her brother Yitzchak, was compounded by the fact that her previ-

ously warm and happy home was suddenly and permanently filled with "tremendous tension." Miriam 4. Sharon and Dov, were no longer fully functioning as parents. Miriam 4. After, Yitzchak's death, Dov became frustrated and angry. Mishael remembers that Gili suffered from Dov's angry outbursts. Mishael 2-3.

Dr. Pollak notes that Gili does not express her feelings verbally. But, her deep sadness and post-trauma symptoms are frequently apparent. Pollak 2. For example, "to this day, if you say the word, "Yitzchak" within her ear-shot, Gili often starts crying. Mishael 3. Gili continues to react to emotional triggers that remind her of Yitzchak. Once, a friend of Yizchak's mentioned that he liked a particular song. Now, when Gili hears that song, she reacts very emotionally and sometimes even cries. Sharon 5; Pollak 2. Gili spends several hours on Israeli Memorial Day watching television as the names of all the victims of terrorism scroll by. She is just waiting for the moment when she can see Yitzchak's name. Sharon 5; Pollak 2; Zamir 2. Gili has suffered from deep depression and sleeps for long periods of time. Sharon 5. Sharon explains that Gili's emotional difficulties trace back to the loss of Yitzchak. At one point, recently, Gili began asking her mother to adopt a boy friend of hers from the residential village. When asked why, Gili responded, "I miss my brother." Sharon 5.

Dr. Pollak concludes, "I have observed her difficulties over the years, and can confidently say that after her brother's murder, [Gili] suffered a definite deterioration in her emotional and behavioral state, and that she and her family continue to struggle with the painful manifestations of [Gili's] emotional state. Pollak 2. Dr. Pollak's assessment is confirmed by Inbal Sharvit Zamir, a licensed psychotherapist, who treated Gili from 2009 until 2012. Zamir 1. Zamir states that Gili's "severe emotional difficulties" were "compounded by the grief she suffered as a result of the murder of her older brother, Yitzchak." Zamir 1. According to Zamir, Gili's primary is-

sues were her "inability to cope with her bereavement over Yitzchak, and the processing of her intense emotional pain." Zamir 1-2. This intense and persistent emotional pain and mourning prevent Gili from engaging in ordinary life activities. Zamir. 2.

Zamir concludes that Gili's enduring bereavement has impacted Gili's life tremendously. Zamir 2. Gili suffers from symptoms of Complex Post Traumatic Stress Disorder ("CPTSD"). Zamir 2, which is caused by continuous exposure to traumatic events that accumulate within the human psyche over a period of months or years. Zamir 2. In Gili's case, CPTSD has led to difficulty in emotional regulation and somatization (complaints of physical ailments). Zamir 2. Gili's trauma has impeded her ability to develop interpersonal relationships, and hindered her ability to establish purpose and meaning in her life. Zamir 2.

The Court applies the *Heiser* framework and awards Geula Weinstock $2,500,000 in solatium damages for the loss of her brother to the terrorist murders. See *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### 5. Aryeh Weinstock is entitled to an award of $2.5 million in solatium damages for the murder of his brother.

Aryeh Weinstock was in the Seventh grade when Yitzchak was murdered. He was extremely close with Yitzchak, and Aryeh admired him tremendously. Aryeh 1. Aryeh recalls Yitzchak as being considerate, fun to be around, and possessing a great sense of humor. Aryeh 1. Aryeh learned to play basketball by watching Yitzchak and, later, by playing with him. Aryeh 1. Aryeh took a rappelling course because Yitzchak was into rappelling. Yitzchak also took Aryeh scuba diving and running with him. Aryeh 1. Aryeh remembers Yitzchak and Moshe including him when they sold willow branches for ritual use outside of their grandparents' home in Jerusalem. Aryeh 2. When Yitzchak and some friends discovered and excavated an ancient spring in the Judean hills, they allowed Aryeh to tag along, and Aryeh reciprocated by bringing them food

from their house. Aryeh 2. Aryeh says of Yitzchak, "He was everything anybody could ever want from an older brother." Aryeh 1.

Aryeh was devastated by Yitzchak's murder. Aryeh 2. Aryeh remembers a neighbor taking him to the hospital after the attack. But, Yitzchak was in surgery and Aryeh was taken to his grandparents' house to spend the night. Aryeh 2. Today, Aryeh maintains: "The single worst memory of my life was when my father came to the house in the morning and said to us, 'it's over,' I started shouting uncontrollably and breaking things all over the house." Aryeh 2.

Aryeh remembers going to a synagogue to pray on the night of the attack. According to Jewish custom, prayers for the sick refer to the patient by name and include the name of the patient's mother. Aryeh neglected to include Sharon's middle name in his prayer, and as he describes his feelings at the time, "[i]n my childish mind, I thought that my slip-up was the cause of Yitzchak's death. For a log time after that, I blamed myself, thinking that if I had remembered the name, he would have survived." Aryeh 2.

Following Yitzchak's murder, Aryeh, who was 14 years old, began experiencing severe difficulties in school. Moshe 2. Miriam recalls that that she was doing her clinical internship at the school Aryeh attended, and whenever she saw him, he was in the corridors rather than in a classroom. Miriam 5. "He actually completely stopped functioning in school." Miriam 5. Aryeh began spending time with friends who had their own behavior issues. Miriam 5. But, due to their own suffering, Sharon and Dov, were unaware of Aryeh's difficulties. Miriam 5. When Aryeh became involved in events that required parental intervention, the neighbors contacted Miriam rather than Aryeh's parents, who were not in an emotional state to address Aryeh's issues. Miriam 5. Miriam asserts that Aryeh required help, but "did not receive a fraction of what he needed." Miriam 5.

Despite his decline in academic performance and other difficulties, Aryeh was accepted into the Ohr Etzion high school where Yitzchak had studied. Aryeh 2, Moshe 2. However, he started suffering from panic attacks and, on several occasions, Aryeh required hospitalization. Aryeh 2. Unable to focus on school work, Aryeh fell behind in his studies and eventually left Ohr Etzion. Aryeh 2; Moshe 2.

The family have different recollections as to why Aryeh left the high school. Aryeh says that he was expelled. Aryeh 2. Moshe and Miriam recall that he dropped out or simply left. Moshe 2; Miriam 5. Sharon recalls that Aryeh's doctor advised him to leave the school due to the extreme pressure he felt living in Yitzchak's shadow. Sharon 6. "His whole identity was attached to Yitzchak – he was known as 'Yitzchak's brother.'" Sharon 6. Sharon states that Aryeh's doctor advised him to leave the school. "The whole environment was putting tremendous stress on Aryeh." Sharon 6. Regardless of the cause of his departure, Aryeh left Ohr Eztion after one year, and had no apparent school alternatives.

Moshe realized that his parents were not fully functioning as parents, and took it upon himself to find a new school for Aryeh. He drove to the remote northern Israeli town of Hispin, and convinced the principal of a *yeshiva* high school there to accept Aryeh -- as an act of charity. Moshe 2. Moshe sees this event as stark evidence of the devastation and disfunction that overtook the Weinstock household as a result of Yitzchak's death. Moshe 2. Aryeh was no more successful in Hispin than he had been in his prior school. He recalls a meeting with the school psychologist where the doctor asked Aryeh why he was failing. Aryeh replied, "Yitzchak studied and that didn't help him. I know I'm going to die whether I study or not." Aryeh 2. Aryeh says that he spent his high school years "drifting around" to various schools and communities, and that the years from 9th through 12th grades "have been almost completely blacked out of my

memory. Aryeh 2.

Aryeh was drafted into the Israeli army, and volunteered for an elite unit. Aryeh 2. He remembers being reckless to the point where his fellow-soldiers said he had a death wish. Aryeh 2. In hindsight, Aryeh agrees with this assessment. He relates that in one operation, while his unit was pursuing a group of terrorists through their headquarters, Aryeh jumped into a room where it was believed the terrorists had taken cover. Aryeh says, "I didn't care if I died. I felt like I had nothing to lose." Aryeh 2. During his military service, Aryeh injured his back severely but made no effort to seek treatment, and he continues to suffer terribly from those back injuries today. Aryeh 3.

Following his military service, Aryeh continued to drift. He traveled in remote areas of South American and Europe, mostly alone. Aryeh 3; Moshe 2. Moshe relates that "Aryeh disappeared, traveling to various countries for long periods. We didn't see him for a very long time." Moshe 2. Aryeh recalls that at one point during his travels, he was paddling a canoe in a river when a flash flood struck. Rather than looking for safety, Aryeh jumped out of the canoe into the water. "At the very last second" he grabbed onto a rope and was saved. Aryeh 3. "I realize now that it was all a futile attempt to escape the tragedy of losing Yitzchak." Aryeh 3.

Aryeh suffered from despair for many years. He says he had no desire to marry, settle down, or have children who he thought would be doomed to suffer. Aryeh 3. His frustration caused him to clash with Dov, and for a period "of several years" the two did not even speak to one another. Aryeh 3. Aryeh says that at the time of Yitzchak's murder, support organizations for terrorism victims did not yet exist. He says, "We didn't know how to handle the shock and the grief." Aryeh 3.

Aryeh continues to have difficulty processing his emotions. Once, his wife was crying

about something, and he admonished her, "Did somebody die? If not, there's nothing to cry about." Aryeh 4. He says "That kind of hardness sometimes overtakes me." Aryeh 4. Aryeh feels that his pessimism adversely affects his relationships with his children as well. Aryeh 4. The impact of Yitzchak's death is a constant in his life; it is "a kind of undercurrent to everything I say and do." Aryeh 4.

Aryeh describes a before-and-after life that was turned by 180 degrees by Yitzchak's murder. Before the murder, "we were a family that was close and happy." Aryeh 4. The family would spend weekends together and with friends laughing, telling stories, and taking long walks. Aryeh 4. "There was a sense of togetherness that is hard to describe. That was all taken away from us with Yitzchak's death. Now, there's always something in our hearts that hurts." Aryeh 4. "It was as if we were taken from one life and just dropped into another." Aryeh 3.

The Court applies the *Heiser* framework and awards Aryeh Weinstock $2,500,000 in solatium damages for the loss of his brother to the terrorist murders. See *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018).

### 6. Chaim Mishael Weinstock ("Mishael") is entitled to an award of $2.5 million in solatium damages the murder of his brother.

Mishael was only five years old when Yitzchak was murdered. Sharon 6. The terrorists deprived him of a brother whom Aryeh describes as "everything anybody could ever want from an older brother." Aryeh 1. Moreover, as Sharon put it, "[s]uddenly his whole family changed." His parent and siblings who had been strong, happy, and supportive were suddenly severely depressed and absent. "Everything around him was filled with sadness and difficulty. He was deprived of a normal childhood." Sharon 6; Mishael 2.

Mishael states that he remembers his parents expressions and reactions from the time of the murder, and he preserved the feelings he experiences at that time for years. "It was like I kept

living that grieving period without end." Mishael 1.  He was "overwhelmed by feelings of confu-
sion and stress that lasted a very long time afterwards." Mishael 1. Sharon sent Mishael for ther-
apy, but he says that he did not continue with any of the therapists. "They all said I was suffering
from post-traumatic stress disorder because of Yitzchak's death. Mishael 1.

Soon after Yitzchak's murder, Mishael began suffering from a sleep disorder and bed
wetting. This lasted until he was 10 years old. Mishael 1. Dov, who was completely unable to
cope with his own grief, started taking Mishael with him as he drove through Arab villages and
the Judean Dessert on his "hunt for the terrorists." Mishael 3. Even as a child, Mishael under-
stood that Dov "just wanted to escape." Mishael had to live with his mother's depression as well.
He remembers Sharon being "constantly tired" and sad. Mishael 2. He remembers an "atmos-
phere of tension and sadness, a heavy, dark cloud" that hovered over his mother. "Emotionally,
she was never there." Mishael 2.

Mishael describes his own emotional state in similar terms. He says that between third
and eighth grades, "I was depressed most of the time. I slept a lot and was barely interested in
anything. I missed a lot of school; I would show up late to class, and leave when I wanted. The
teachers made allowances for me because they knew I was Yitzchak's brother." Mishael 1-2.

When Mishael became a teenager he started developing a life outside of the family home,
especially through sports. He joined the local basketball league. Mishael 2. Other children's par-
ents would attend the games. But Mishael's parents did not. "They just couldn't do normal things
like that." Mishael 2. At the same time, Mishael started to feel that he did not want his parents
involved in his "other" life. And, Mishael wanted to separate from theirs. Mishael 2. When Mis-
hael started high school, he enrolled in a school in a different town and moved into the dorm. He
describes feeling confused and alienated from his parents. Mishael 2.

Mishael's feelings of alienation were intensified by what he describes as a sort of bond that his parents and siblings shared, and he was not a part of. "They knew Yitzchak, they lost Yitzchak… I had been too young to really know him. I didn't even attend his funeral; my mother thought it would be too hard on me."  Mishael 3. Mishael "felt like an outsider in my own family." Mishael 3. Mishael attempted to bridge the distance from his family by imagining what Yitzchak was like and what it would have been like to have been his brother. Mishael 3. "I realize now that I was developing a kind of derivative identity as 'the brother of Yitzchak the victim,' instead of an identity of my own." Mishael 3.

Mishael continued to deal with depression. When he reached his late teens, Mishael could not even conceive of being alive at age 20 or 21. But, he was not disturbed by that feeling. "I felt it was part [of] my destiny, just another part of life." Mishael 2. He recalls a hiking trip when he deliberately ate a certain plant that someone had warned might be poisonous. At the same time, Mishael says that he lives in a perpetual survival mode, where he is constantly thinking about possible dangers. Mishael 3. For example, when his wife does a mundane activity such as taking a shower, he fears that she might slip and get hurt. Every day he fears that he will receive a call informing him of some family catastrophe. Mishael 3.

Yitzchak's murder has left Mishael without his brother and deprived him of the positive, nurturing and empowering family relationships that he should have had – and that his siblings in fact had. He continues to suffer from depression and fear that were caused by Yitzchak's murder and the collective breakdown suffered by his entire family.

The Court applies the *Heiser* framework and awards Mishael Weinstock $2,500,000 in solatium damages for the loss of his brother to the terrorist murders. See *Estate of Hirshfeld v. Islamic Republic of Iran*, 2018 U.S. Dist. LEXIS 148416 (D.D.C. 2018) (granting siblings who

were only 4 and 7 years old at the time of their brothers murder damages awards in amount identical to that granted to older siblings who shared mature, developed relationships with decedent).

### 7.   The estates of Rabbi Simon and Mrs. Shirley Dolgin are each entitled to awards of $2.5 million in solatium damages for the murder of their grandson.

Yitzchak had shared an unusually close relationship with his maternal grandparents. Sharon 6. Yitzchak often visited his grandparents, both with his family and on his own. Sharon 6; Harel 2; Horowitz 3. Rabbi Dolgin's long-time, close friend Israel Harel recalls that on several occasions when he visited the Dolgins he found Yitzchak at their home engaged in Talmudic or Biblical study with his grandfather. Harel 2. Yitzchak's proficiency in these studies was a great source of pride for Rabbi Dolgin. Harel 2.

Tzirl Horowitz, who had been a close childhood friend of Sharon Weinstock and her sisters in Los Angeles, and who as an adult developed a close friendship with Mrs. Dolgin as well, states that the Dolgins saw Yitzchak as the apple of their eye. Horowitz 3. Long-time family friend Jonathan Bachrach used the same expression to describe the Dolgins' tremendous love and esteem for Yitzchak. Bachrach 3. He adds: The Dolgins thought of Yitzchak as their best expression of everything to which they had dedicated their lives. They spoke of Yitzchak as if he were a young King David, bearing hope and promise." Bachrach 3. At some point prior to Yitzchak's death, Mrs. Dolgin told Jonathan Bachrach, "I think Yitzchak is destined to make us all laugh at the troubles we have suffered in this world so far, and we will go smiling into the future." Bachrach 4. While the reference to "laughter" was a reference to the Hebrew root for the name Yitzchak, which means "laughter," the statement reflects Mrs. Dolgin's limitless hope and expectation Yitzchak's realization of his great potential. But, as Mr. Bachrach relates, after Yitzchak's murder, he "never saw Rabbi or Mrs. Dolgin smile again." And he "never again heard Sharonbeth, [his] lifelong friend, laugh." Bachrach 4. Tzirl Horowitz says that both Rabbi and Mrs. Dolgin were "destroyed by Yitzchak's death. Horowitz 3.

Immediately after the  terrorist attack, Mrs. Dolgin joined the family in the hospital waiting room. Horowitz 2. As the surgery continued late into the night, Yitzchak's grandmother grew tired and eventually fell asleep. Horowitz 2. When someone woke Mrs. Dolgin and told her what had happened, she screamed in horror, "What have I done?!" Horowitz 2. According to Tzirl Horowitz, Mrs. Dolgin was speaking to G-d and blaming herself for her grandson's death. Horowitz 2. Yitzchak's grandmother felt so connected to him that she was sure that his death must have been because of some flaw in her.

Rabbi Dolgin did not go to the hospital that night. He had been diagnosed with Parkinson's disease and his children tried to shield him from the news as long as possible. They were concerned that Rabbi Dolgin could not bear to hear that Yitzchak had been shot and grievously wounded. Glasser 3. They hoped that perhaps Yitzchak's condition would improve. Glasser 3. But by early the next morning, Yitzchak had died. Saralee Glasser went to the Dolgin home to break the news to her father. She remembers gently waking him and telling him that Yitzchak had died. Saralee remembers her father's eyes widening in shock and she remembers his pained expression as he exclaimed, "Oh my G-d, NO!" Glasser 3. Mrs. Dolgin joined them in the room, and the three sat, "speechless and unbelieving, trying to absorb the horrible news." Glasser 3. Saralee says she could feel the last of her father's strength oozing out during those moments. Glasser 3.

The day after the attack, Rabbi Dolgin's old friend, Israel Harel rushed to the Dolgin's home when he heard the news on the radio. Mr. Harel says this was the first time he had ever seen Rabbi Dolgin cry. Harel 3. Rabbi Dolgin, who had been a strong man with a sharp mind, began to rapidly deteriorate. "At once he looked like and old man…. He lost his drive for life." Harel 3.

Yitzchak's murder was not the first tragedy that befell the Dolgins. Their daughter, Gaola had died just after turning 14 following years of illness. Another daughter, Marcia, died after a 6-year battle with cancer when she was 35, leaving her husband and three young children. Glasser 1-2; M. Dolgin 2-3; J. Dolgin 2. The Dolgins managed to persevere. Bachrach 2. They "carried their pain within and continued to live active and fruitful lives." Glasser 2. Despite the heart-breaking deaths of two of their daughters, the Dolgins continued to provide a loving, fun and protective home for their remaining children and grandchildren. T. Dolgin 2. "Yitzchak's death changed that in a second." T. Dolgin 2. The Dolgins home instantly and irreversibly "became a home of sorrow and tears." T. Dolgin 2. Their son, Jess Dolgin says, "For my parents, Yitzchak's murder was the coup de grace – a final, fatal emotional blow that, for all intents and purposes, ended their lives." J. Dolgin 2.

Jess Dolgin relates, "I remember my mother saying that there is nothing more painful than losing a child, except perhaps watching your own child lose her child." Helplessly witnessing Sharon suffer the loss of her son tormented Shirley Dolgin. Jonathan Bachrach recalls driving Mrs. Dolgin home one night a couple of years after Yitzchak's death. They discussed the deaths of Gaola and Marcia. Then, Mrs. Dolgin related Sharon's reaction to Yitzchak's murder: "Sharonbeth put her head on my shoulder and sobbed, 'Mommy, I cannot survive this! Tell me Mommy! Tell me how you survived Gaola's death! What did you do when Marcia died? How did you keep on living? Tell me now! Otherwise, I cannot go on!" Bachrach 3.

The *Heiser* framework is based upon awarding similarly situated terrorism victims similar damages awards for their emotional damages. In accordance with the *Heiser* framework and the holding in *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d at 86, the Court awards to each of the estates of Rabbi and Mrs. Dolgin damages in the amount of $2.5 million.

## CONCLUSION

The Terrorist Shooting and murder of Yitzchak Weinstock was a cataclysmic event from which no member of the Weinstock-Dolgin family has fully recovered. Miriam; Moshe 2-4; Aryeh 4; Mishael 2-3; Bachrach 2-4; J. Dolgin 3. Aside from the horror of the murder, and aside from the never-ending grief, bereavement, and frustration over their loss, Yitzchak's death caused the family to descend into severe disfunction as a Sharon and Dov lost their ability to function as parents. Moshe 2-4; Aryeh 3; Mishael 2-3; Miriam 2-3. The lack of parental presence and involvement compounded the impact of Yitzchak's murder on his siblings. Moshe 2-4; Aryeh 3; Mishael 2-3; Miriam 2-3. Sharon, Dov, and their remaining children never recovered; "even now, the Weinstock family itself, remains ***defined*** by the murder of Yitzchak." J. Dolgin 3.

For Rabbi and Mrs. Dolgin, Yitzchak's grandparents, the devastation of their grandson's murder was exacerbated by witnessing the unspeakable anguish of their daughter, Sharon. Bachrach 3; Jess Dolgin 2-3. Moreover, following the premature deaths of two daughters, Yitzchak's sudden and violent death was the last straw. It fell upon the Dolgins with the combined weight of all of their prior tragedies. As Michael Dolgin explained, following their daughters' deaths, Yitzchak's murder had "an exponential impact" on the Dolgins. "Imagine a parent standing by and witnessing helplessly, fully and graphically their child's pain and suffering – the ultimate pain and suffering – which they themselves had known and endured with the untimely deaths of two of their own children." M. Dolgin 3. "The death of a child is traumatic for any parent. By this standard, my parents were victims of trauma, multiple trauma, and exponential re-traumatization. The physical and emotional effects of Yitzchak's murder were more than they could bear." M. Dolgin 3.

For the foregoing reasons, it is ORDERED AND ADJUSGED as follows:

1. The Court GRANTS default judgment against Defendant Mousa Mohammed Abu Marzook.

2. Damages are awarded to the Plaintiffs as follows: The Estate of Yitzchak Weinstock is awarded $1,291,000 in compensatory damages. Sharon Weinstock and the Estate of Dov Weinstock are each awarded $5 million in compensatory damages. Each of Yitzchak's siblings are awarded $2,500,000 in compensatory damages, and the Estates of Rabbi Simon and Mrs. Shirley Dolgin, Yitzchak's maternal grandparents are each awarded $2,500,000 in compensatory damages. Pursuant to 18 U.S.C. § 2333(a), the amounts of compensatory damages are trebled for a total damages award of $78,873,000.

An appropriate Judgment accompanies this memorandum opinion.

DONE AND ORDERED at Miami, Florida this _ day of _____, 2018.


/s/ Robert N. Scola_____
United States District Judge